IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| THE CHARTER OAK FIRE INSURANCE COMPANY,<br><br>                  Plaintiff,<br><br>vs.<br><br>JON SHERNER, et al.,<br><br>                  Defendants. | CV 22-132-BLG-SPW-TJC<br><br>**FINDINGS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE** |

Plaintiff The Charter Oak Fire Insurance Company ("Charter Oak") brings this action against Defendants Jon Sherner and Tracey Sherner (the "Sherners"), Timberline Gas, LLC d/b/a Madison River Propane ("Madison River"), H. Shepard Bailey and ThompsonGas, LLC in relation to insurance coverage for an underlying state court action brought by the Sherners against Madison River and others.  (Doc. 1.)[1]  Charter Oak seeks declaratory judgment as to the applicable limit of insurance available for the Sherners' claims under a Charter Oak policy.

Presently before the Court are Charter Oak's Motion for Summary Judgment (Doc. 17), and the Sherners' Motion for Summary Judgment (Doc. 24).  The motions are fully briefed and ripe for the Court's review.  For the following

---

[1] ThompsonGas, LLC was dismissed without prejudice on June 7, 2023.  (Doc. 16.)  Timberline Gas, LLC d/b/a Madison River Propane and H. Shepard Bailey were served, but to date have not appeared, been dismissed, or had default entered against them.

reasons, the Court recommends that Charter Oak's motion be **GRANTED**, and the Sherners' motion be **DENIED**.

## I.     BACKGROUND

### A. Underlying Action

On October 12, 2022, Charter Oak's insured, Madison River, was named as a defendant in a lawsuit entitled *Jon Sherner and Tracey Sherner v. Timberline Gas, LLC, d/b/a Madison River Propane, H. Shepard Bailey, ThompsonGas LLC, J. Does 1-10, and J. Doe Business Entities 1-10*, in the Montana Twenty-Second Judicial District Court, Carbon County, Cause No. DV-22-87 (the "Underlying Action").  (Doc. 1-6.)

The complaint in the Underlying Action alleges the Sherners were in the process of constructing a small residential cabin on their property in Roberts, Montana in 2020.  Madison River was hired to install a propane tank and all necessary components to feed propane into the cabin.  On October 24, 2020, Jon intended to run the furnace for the first time, and went into the crawlspace to turn on the furnace.  Immediately upon starting the furnace, however, propane gas in the crawlspace ignited and a large explosion occurred.  Jon was located at the epicenter of the explosion.  He was thrown against the crawlspace wall, and was seriously burned over a significant portion of his body.  Jon managed to exit the

cabin, and a passerby on the nearby highway pulled over and drove Jon to the hospital in Red Lodge, Montana.

Jon was flown to Salt Lake City, Utah due to the nature of his injuries. Jon's wife, Tracey, was on the life flight with Jon, and spent six weeks with him in the Intensive Care Burn Unit ("ICBU"). Tracey witnessed Jon's pain and suffering during the life flight and during his care in the ICBU, and was required to become his caretaker after his discharge. The Sherners allege that as a result of Jon's injuries, Tracey has suffered severe emotional distress, was forced to become Jon's caretaker, and lost earnings due to her care of Jon.

The Sherners allege that Madison River failed to correctly install the propane line and/or components. As a result, propane leaked into the cabin and consolidated in the crawlspace, causing the explosion and Jon's life-threatening injuries.

The underlying complaint also alleges that, while Jon was in the ICBU, Madison River returned to the home without his knowledge and placed a "red tag" on the regulator connected to the propane tank. It is also asserted in connection with the current motions that after Jon was injured, Tracy received communications from Madison River in the form of invoices in the amount of $75 for rental of the propane tank.

/ / /

**B.  Coverage Provisions**

At the time of the explosion, Madison River was insured under a

Commercial Policy, issued by Charter Oak, Policy No. Y-660-5F445651-COF-20

(the "Policy").  The Policy's Commercial General Liability Coverage included an

Each Occurrence Limit of $1,000,000 and a General Aggregate Limit of

$2,000,000.  (Doc. 1-3.)

The CGL Coverage of the Policy provided in pertinent part:

**SECTION III – LIMITS OF INSURANCE**

**1.** The Limits of Insurance shown in the Declarations and the rules
below fix the most we will pay regardless of the number of:
> **a.** Insureds;
> **b.** Claims made or "suits" brought; or
> **c.** Persons or organizations making claims or bringing
> "suits."

**2.** The General Aggregate Limit [$2,000,000] is the most we will
pay for the sum of:
> **a.** Medical expenses under Coverage **C**;
> **b.** Damages under Coverage **A** [];
> **c.** Damages under Coverage **B**.

. . .

**5.** Subject to Paragraph **2.** or **3.** above, whichever applies, the
Each Occurrence Limit [$1,000,000] is the most we will pay for
the sum of:
> **a.** Damages under Coverage **A**; and
> **b.** Medical expenses under Coverage **C**;
> because of all "bodily injury" and "property damage" arising
> out of any one "occurrence."

(Doc. 1-4 at 13.)

4

The Policy further defined "occurrence" as "[a]n accident, including continuous or repeated exposure to substantially the same general harmful conditions." (*Id.* at 19.)

In response to a demand by the Sherners, Charter Oak paid the $1,000,000 Each Occurrence Limit of the CGL Coverage. Charter Oak then filed this action on November 22, 2022, seeking a declaration that the $1,000,000 Each Occurrence Limit is the applicable limit of insurance available under the Policy in relation to the claims by the Sherners in the Underlying Action. (Doc. 1.)

On January 23, 2023, the Sherners filed a Counterclaim against Charter Oak. (Doc. 9 at 4-7.) The Sherners argue the Underlying Action contains stand-alone claims for both Jon and Tracey, and that Tracey's claims constitute a separate "occurrence" under the Policy. The Sherners, therefore, seek a declaration that Tracey is entitled to claim coverage under the "Each Occurrence" Limit of the CGL Coverage in the Policy in the amount of $1,000,000 for her claims.

## II.    DISCUSSION

Charter Oak now moves for summary judgment on the grounds that the $1,000,000 Each Occurrence Limit of the CGL Coverage is the applicable limit of insurance available under the Policy. The Sherners have filed a cross motion for summary judgment, arguing an additional $1,000,000 in coverage is available to Tracey for her stand-alone injuries.

A.    **Legal Standards**

1. **Summary Judgment**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Material facts are those which may affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable fact-finder to return a verdict for the nonmoving party.  *Id*.  If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue of fact exists.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The Court must consider each motion on its own merits when parties file cross-motions for summary judgment.  *Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).  The fact that both

6

parties moved for summary judgment does not vitiate the Court's responsibility to determine whether disputed issues of material fact are present.  *Id*.

## 2.  Interpretation of Insurance Contracts

The Court's jurisdiction over this action is based on diversity of citizenship. Thus, the Court must apply the substantive law of Montana.  *Medical Laboratory Mgmt. Consultants v. American Broadcasting Companies, Inc.*, 306 F.3d 806, 812 (9th Cir. 2002).  In Montana, the interpretation of an insurance contract is a question of law.  *Scentry Biologicals, Inc. v. Mid-continent Cas. Co.*, 319 P.3d 1260, 1264 (2014).  A court interpreting an insurance policy is to read the policy as a whole and, to the extent possible, reconcile the policy's various parts to give each meaning and effect.  *O'Connell v. Liberty Mut. Fire Ins. Co.*, 43 F.Supp.3d 1093, 1096 (D. Mont. 2014) (*citing Newbury v. State Farm Fire & Cas. Ins. Co. of Bloomington, Ill*., 184 P.3d 1021 (2008)).  In interpreting insurance contracts courts also must give terms and words in the contract their usual meaning and construe them using common sense.  *Id*.  "It is well established that in construing and analyzing the terms of an insurance policy we look first to the policy's plain language.  In doing so we apply the 'common sense meaning as viewed from the perspective of a reasonable consumer of insurance products.'"  *Monroe v. Cogswell Agency*, 234 P.3d 79, 82 (2007) (citing *Stutzman v. Safeco Ins. Co. of America*, 945 P.2d 32 (1997).

Charter Oak argues the Sherners' claims are subject to a single $1,000,000 Each Occurrence Limit because Jon and Tracey's claims arose from the same "occurrence" – namely, the explosion. The Sherners counter that their claims are not subject to the $1,000,000 per occurrence limit. They argue, first, that the coverage provisions of the policy are ambiguous, and should be construed against Charter Oak and in favor of extending coverage. The Sherners also argue that Tracey's injuries were the result of a separate "occurrence," which includes Tracey's emotional distress from witnessing Jon's pain and suffering, and from receiving post-explosion communications from Madison River regarding rental due on the propane tank.

**B.    The Policy is Not Ambiguous**

As noted above, the Policy defines "occurrence" as "[a]n accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Doc. 1-4 at 19.) The Sherners argue the term "accident" is not defined in the Policy and is ambiguous.

Any ambiguities in the insurance contract are construed against the insurer and in favor of extending coverage. *Revelation Indus., Inc. v. St. Paul Fire & Marine Ins. Co.*, 206 P.3d 919, 929 (2009). A contract provision is ambiguous if it is "reasonably subject to two different interpretations." *Fisher ex. rel. McCartney v. State Farm Mut. Auto. Ins.*, 305 P.3d 861, 865 (Mont. 2013) (citing *Modroo v.*

8

*Nationwide Mut. Fire Ins. Co.*, 191 P.2d 32 (Mont. 2008)).  "Whether a provision of an insurance contract is 'reasonably susceptible to two different interpretations,' is determined from 'the viewpoint of a consumer with average intelligence, but untrained in the law or the insurance business.'"  *Id.* at 865-66.

 In support of their ambiguity argument here, the Sherners rely primarily on the Montana Supreme Court's decision in *Wendell v. State Farm Mut. Auto Ins. Co.*, 974 P.2d 623 (Mont. 1999).  The court in *Wendell* did find the term accident to be ambiguous under the specific circumstances and coverage provisions in that case.  But *Wendell* involved the issue of whether an intentional act may be considered an accident in the context of uninsured motorist coverage.  That is obviously not the issue here.

Moreover, since the *Wendell* decision, the Montana Supreme Court directly considered the issue presented here – whether the same definition of an occurrence is ambiguous in defining a liability policy's per occurrence limits.  In *Heggem v. Capitol Indem. Corp.*, 154 P.3d 1189 (Mont. 2007), a toddler died of an overdose of diphenhydramine administered by a daycare.  Parents of the toddler filed suit against the daycare for damages.  The toddler's parents also subsequently brought an action under Montana's Unfair Trade Practices Act, alleging that the insurer of the day care facility misrepresented that the available policy limits were $300,000.

The policy had a coverage limit of $300,000 for any one occurrence, and an aggregate limit of $600,000.    As in this case, the policy in *Heggem* defined the term "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.* at 1193-94.  The plaintiffs argued that the definition was reasonably subject to more than one interpretation, and was thus ambiguous.

The Montana Supreme Court rejected this contention in the context of a per occurrence policy limit provision.  When interpreting such a provision, the court found the vast majority of courts interpret the language "from the perspective of causation – referring to the cause or causes of the damage or injury – and not the number of injuries or claims." *Heggem*, 154 P.3d at 1195.  The Montana Supreme Court, therefore, adopted the "'cause' theory for interpreting the term 'occurrence' in an insurance policy that limits the insurer's liability to a specified amount per 'occurrence.'" *Id.*  When construed in this manner, the court found that none of the alternative interpretations of occurrence proposed by the plaintiff were reasonable, and therefore concluded the plaintiffs did not established that the term occurrence as used in the policy was ambiguous.  *Id.* at 1197.

Applying the "cause" theory here, it is clear that the Sherners' claims arise from the same cause – the explosion.  As discussed below, the different

10

interpretations of the per occurrence limit offered by the Sherners are not reasonable when viewed from the perspective of causation.

### C.    The Allegations in the Underlying Complaint Constitute One "Occurrence"

In the Underlying Complaint, the Sherners allege injury to Tracey based on "watching her husband's pain and suffering, including being told he died and was resuscitated," being "forced to care for Jon due to the injuries he suffered from the explosion," and suffering "lost earnings due to her care of Jon."  (Doc. 1-6 at ¶¶ 79-88.)  The Sherners argue that Tracey's emotional distress claim constitutes a separate occurrence under the Policy.

The Montana Supreme Court considered a similar claim in *Heggem*, and concluded that a claim of emotional distress based on injuries to another person did not constitute a separate "occurrence" for purposes of CGL coverage.  *Heggem*, 154 P.3d at 1197.  As in this case, the toddler's family members sought recovery under several multiple "occurrence" theories, including that the toddler's death was one occurrence, and the resulting emotional distress to each of three surviving family members constituted three separate additional occurrences.  *Id.* at 1196-97. The court disagreed with the family members' arguments, and found the emotional distress claims were "effects, not causes," and thus not separate occurrences under the policy.  *Id.* at 1197.

11

The Montana Supreme Court's determination in *Heggem* is consistent with other courts' application of the cause theory. "The cause approach stands in contrast to the 'effects approach,' which calculates the number of occurrences by looking to the effect of the accident or, in other words, how many individual claims or injuries resulted therefrom." *Hollis v. Lexington Ins. Co.*, 180 F. Supp. 3d 422, 429 (E.D. Va. 2016), aff'd, 682 F. App'x 206 (4th Cir. 2017) (internal quotations and citations omitted). Courts applying the cause theory, on the other hand, focus on the cause of the injury, "not the 'number, magnitude, or time of the injuries." *AIG Specialty Ins. Co. v. Liberty Mut. Fire Ins. Co.*, 2018 WL 1863056 at *3 (D. Nev. Apr. 18, 2018) (quoting *Bish v. Guar. Nat. Ins. Co.*, 848 P.2d 1057, 1058 (Nev. 1993)). If the "injuries stem from one proximate cause there is a single occurrence." *Id.*

The Sherners argue that Tracey's experiences constitute "multiple causes, or actions, giving rise to Tracey's emotional distress outside of just Jon's injuries." (Doc. 25 at 13.) But when evaluated under the cause theory, it is clear that Tracey's claims for emotional distress, whether from witnessing Jon's injuries and treatment, or her lost earnings due to her care of Jon, are effects of the explosion. Because both Tracy and Jon's injuries and claims are the proximate result of the explosion, they do not constitute separate "occurrences" under the Policy.

12

Tracey also argues she suffered her own separate "accidents" based on Madison River's post-injury conduct, such as sending an invoice for tank rental, or learning that Madison River visited the property after the explosion without the Sherners's knowledge.  (Doc. 25 at 11.)  The Court notes, first of all, that the Underlying Complaint did not even mention Madison River's invoices for tank rental, nor did the Sherners claim any damage from either the rental invoices or from Madison River's alleged visit to the property.  (*See* Doc. 1-6.)

Nevertheless, like Tracey's emotional distress claims related to witnessing Jon's injuries and recovery, her claimed injuries from Madison River's conduct are effects of the explosion.  If Tracey experienced emotional distress as a result of these events, it was because of how they relate to the initial and primary cause of her emotional distress.  Indeed, the reason asserted in connection with the current motions for why Madison River's post-injury conduct was emotionally distressing is because of the explosion.  *See e.g.* Doc. 26-1 at ¶ 2 ("While caring for Jon, I received requests to make payment to Madison River Propane, for the work that nearly killed Jon and was responsible for injuring him."); ¶ 5 (stating the communications from Madison River were distressing because they "served as a constant reminder of his accident").

Therefore, the Sherners contend Tracey experienced emotional distress from these post-injury events because they relate to the explosion.  The Sherners have

not made a showing as to how Madison River's post-injury conduct would have caused any emotional distress if not for the fact of the explosion. As recognized by the Third Circuit, "events can be parsed into several distinct stages, each describing the ultimate cause in greater and greater detail. But the cause theory is designed to avoid the trap of infinite regression." *Real Legacy Assurance Co., Inc.*, 409 Fed. Appx. 558, 562 (3rd Cir. 2011). The Sherners attempt to parse Tracey's emotional distress claim into multiple stages, thereby converting multiple contributing factors to her emotional distress into separate occurrences. But Tracey's emotional distress claims are effects from one "occurrence" – the explosion.

Accordingly, because the Court finds the explosion was the sole "occurrence" that caused of each of the Sherners' claims, coverage is limited to the $1,000,000 Each Occurrence Limit under the Policy.

## III.  CONCLUSION

Based on the foregoing, **IT IS HEREBY RECOMMENDED** that:

1.   Charter Oak's Motion for Summary Judgment (Doc. 17) be **GRANTED**;

2.   The Sherner's Motion for Summary Judgment (Doc. 24) be **DENIED**.

**NOW, THEREFORE, IT IS ORDERED** that the Clerk shall serve a copy of the Findings and Recommendations of United States Magistrate Judge upon the parties. The parties are advised that pursuant to 28 U.S.C. § 636, any objections to

14

the findings and recommendations must be filed with the Clerk of Court and copies

served on opposing counsel within fourteen (14) days after service hereof, or

objection is waived.

DATED this 29th day of December, 2023.

_____

TIMOTHY J. CAVAN

United States Magistrate Judge